Good morning, Your Honors. My name is Michael Hogan. I represent the Appellants and Defendants California Center for the Arts Escondido, Alan Corbin and Randy Vogel. I'd like to reserve with your permission two minutes for rebuttal. There are three issues we've placed before the Court to ask you to reverse the judgment of the District Court. The first relates to the District Court's finding and determination that the modification the Court ordered would not cause a fundamental alteration of the services provided by the California Center. We believe that determination as a matter of law is in error. We believe that the Americans with Disabilities Act requires the Center generally to permit service animals to accompany their owners to performances in the Center's concert hall, and we believe that the Center has an obligation to provide the broadest feasible access for a disabled person with his or her service animal. We believe, however, that the evidence was uncontroverted, that of the Center's director, Mr. John Haynes, that allowing the modification ordered by the District Court to permit service animals to accompany their owners to performances in the Center's concert hall. The reasons for that are fairly straightforward, and that is that the Center, unlike other types of entertainment venues or places which provide live performances, generally offers its live performances in single performances only. Secondly, we have Mr. Haynes' testimony that any unexpected noise can cause a fundamental alteration of the Center's services. Kennedy. Well, while you're on that subject, the record shows that this yip, the single yip in the first performance was during an intermission. Gershengorn. That's correct. Kennedy. How can that disrupt anything? Gershengorn. Your Honor, the concern we have is that with this particular plaintiff and her service animal, that there were two occasions, both in intermissions. The Court is correct, though, they were in intermissions. They led us to have a concern that those same noises could occur during a live performance. There's no dispute the initial and the previous noises made by the dog at prior performances were during intermissions. Kennedy. But what does that yip sound like? Gershengorn. Your Honor, if I could reproduce it for you, I would, but I'm afraid I was not able to. Kennedy. We could get you a job in Burbank, one of the studios. Gershengorn. I've been asked to do a lot of silly things as a lawyer, Your Honor, but I've never been asked to bark in court before. I'll have to decline the invitation. Kennedy. Well, aren't your people borrowing trouble by anticipating that this dog who yips apparently only during intermissions might sometime have a yipping fit during the main show? Gershengorn. Well, we certainly have borrowed trouble because that's what we assumed, was we assumed that this particular service dog presented that possibility. And certainly we now find ourselves, and we think the district court's determination puts us in that position in the future, that in order, under the district court's determination, in order for us to exclude a service animal that has made noise previously, we would have to somehow determine that the noise was not made for a proper purpose, was not made to communicate something for the benefit of the disabled owner, or was not a noise that if made by a human would be acceptable. Now, how we make that determination, I couldn't tell the Court. I think that would require, as a practical matter, an investigation that certainly nonprofit arts organizations would be loathe to undertake because of the cost involved and because of the probability that they could easily end up in court just as we have here today. That's part of the reason we believe the test enunciated by the district court is simply unworkable as a practical matter, as well as being contrary to the law. The second concern we have is that the modification of the court order is also simply unreasonable in these particular circumstances. Well, isn't the Center's concern that you do not want distracting disturbances during the concert, so that if somebody had a coughing fit or some sort of a medical emergency that created a big disturbance, you would want to help that person out of the concert hall so that the concert could go on? Correct, Your Honor. And what's the difference with a service dog that, for some reason, might make an unusual and distracting amount of noise? Wouldn't you simply handle it the same way? Perhaps ask the person to step out of the concert hall and tell whatever was exciting the animal was taken care of. To answer the questions in reverse order, Your Honor, we may well handle it the same way, but the difference is significant. As Mr. Haynes testified, audiences in live performances, as well as performers, have certain expectations about the nature of the experience. Part of that is that I think over the course of human history of performances, human beings certainly cough and have a variety, make a variety of other noises throughout a performance. One only has to attend a play or a movie to realize that audiences make noises. There are certain noises that performers and audiences have come to expect, coughs we may hear but don't necessarily register in the same way that a dog's barking would register. That's the concern expressed by Mr. Haynes, that a dog's bark is an unexpected noise that because of the nature of the noise has a very different impact than you or I might have if we coughed even in a loud way. But take it to its logical conclusion, your policy would exclude all service animals from the concert itself on the possibility that they might make noise. It could well do that. That's entirely possible. In this case, and I think that the determination the district court was required to make was one unique to these circumstances, that could be the result. But we, the determination we made... The district court found that whatever noise the dog made was made not at the time that the artist was performing, but at intermission, and specifically that the dog made a noise to protect Ms. Lentini because people were getting close to her, which presumably is one of the purposes of the service dog, to protect the area around Ms. Lentini. But your personnel then took that as evidence that the dog would create a disturbance during the concert. And that's the problem I'm having with the logical conclusion to your argument, which would lead to complete exclusion of all service dogs from performance. I think the way that I could offer the Court to consider it or ask the Court to consider it is that whether Ms. Lentini's dog, whether those noises were appropriate or necessary, particularly the prior performances in terms of occurring during the intermission and apparently to protect her, whether those were necessary and appropriate goes to the question of whether the modification the district court ordered is a reasonable modification, and we have no dispute with that. What we're contending is that once, as a matter of law, once that determination is made, this is a reasonable modification, then there's a second step that has to occur. And that second step is where we think the district court failed, and that is it must look then to what's the impact of that reasonable modification on the center's services. And if it does fundamentally alter those services, then, even though it's a reasonable modification, a reasonable request, the center is not required to implement it and does not discriminate if it fails to implement that modification. And we think that's the key error that the district court made, is by focusing on the question of the reasonableness of the dog's noise, was it necessary, did it communicate something important? That's step one. If that imposes it, then the plaintiff has met her burden of proof. If that imposes a duty, shifts the burden to the defendants. Alito, your position is that even if the service animal behaves in a manner in which it was trained, that that is nonetheless too disruptive or could potentially be too disruptive and would destroy, what were the words, the artistic ambiance? Artistic integrity, Your Honor. Integrity, that was it, and therefore should never be allowed inside the concert hall. In this setting, Your Honor, that's correct. We have in the- So how is that accommodation under the ADA? Your accommodation is lock the door. It's an accommodation that does not allow a service animal in this setting access. And that's an ADA, the ADA does not mandate that in every setting that there be access. It makes clear, there are rare circumstances, and we're submitting to the Court, this is one of those rare circumstances because of the nature of the performance. A live performance, seldom replicated, noises are disruptive to audience and performance. We agree about that. Now, there's another factor to consider, which is that part of the reasonable modifications we made for Ms. Lentini, and they included a whole host of steps throughout the stages of one's participation at a performance in terms of offers of assistance and so on. But more importantly, on the night in question, on January 13th of 1999, Ms. Lentini was accompanied by an able-bodied human companion who assisted her in a variety of ways. Now, that's her accommodation or possible accommodation. The center also had available human assistance. They had ushers, not only regular ushers, but specially trained ushers, wearing special jackets to be identifiable, that could have provided the same assistance. But she said that she couldn't, you know, it's just not good to leave the dog in the car because she and the dog are really one, you know, and they're bonded. And, you know, you leave a dog that's bonded to you in a car. It's not good for the dog. I understand. It's not good for you. I mean, I still have a guilty conscience about leaving my dog on vacations, you know. And because dogs get very emotional about these things. And as the court points out, there was testimony from Ms. Lentini's expert to that effect about the bond between a disabled person and his or her service animal. We don't dispute that. We don't dispute that, Your Honor. We think, though, again, to come back to the concept. That all goes to the question of the reasonableness of the modification. Ms. Lentini's actions may have been reasonable in general. I just got a situation here where the dog yipped, yipped twice. Never yipped when there was a concert. What about people that snore when you have these concerts? Your Honor, I'm fortunate. If we didn't produce evidence, we certainly would have shown there's no snoring at our concerts. No one ever goes to sleep at your concerts. None at our concerts, Your Honor. Don't invite me there. These are stimulating events, Your Honor. But we think, we just. I even fall asleep in the dentist chair. So I'm trying to stay awake this morning. Well, I'll see if I can liven things up, Your Honor. The concern, though. You're doing fine. The concern is really, there's no dispute about the reasonableness of the initial request to have a service animal accompany her. The problem is in a setting of this particular type. Ms. Lentini argued in her appellee's brief that there are a whole series of other circumstances where a service animal's noise might not be disruptive or inappropriate. Outdoor concerts, outdoor athletic events, a different type of service animal, perhaps a seizure alert dog. But here we're concerned about a very particular dog, a very specific occasion, a very particular type of performance in which noise has an unusual impact. Were this a Rolling Stones concert, we wouldn't have quite the concern about noises made. Let me ask, under your policy, if I were blind and I showed up with my seeing eye black Labrador retriever, would you allow me into your concert hall with my dog so that I could listen to the music? Or because of the fact that I had a dog that might bark, would you exclude the dog and me? The answer would be yes, Your Honor. You would be allowed to come in. We are talking about a dog. Because the dog doesn't have a prior, is that it? Correct, Your Honor. In this case, that's the situation. Okay. But does it matter that my dog only barks at intermission when people invade my space because they might step on my toe because I can't see them? Your Honor, we think, yes, it matters very much because without. That would be okay under your policy. No, without the ability to make a judgment to exclude a service animal which has made noise at a prior event, we're left in the position of waiting until there is a disruption, then determining, this is under the district court's view, first we have to wait until the disruption has occurred. At that point, we can't unring or undo the noise. It's been done. We then have to make an investigation of some sort to determine whether it was an appropriate noise. And only then can we determine whether in the future we could exclude an animal. As I mentioned earlier in my argument, Your Honor, as a matter of law, I don't think that's required. And as a practical matter, it simply won't happen. It is simply impossible for nonprofit arts groups to engage in that type of quasi-judicial proceeding, especially with the threat of litigation to follow. The last points I'd just like to make, we covered them, I think, fairly, as completely as we could in our briefs. But the question of damages, we'd just like to remind the Court that those are questions we've raised. We don't think, for example, that the award of damages against the center itself and the other two individual defendants is appropriate because there was no finding that Ms. Lentini intended to attend the seven particular subsequent performances for which damages were assessed. Secondly, the other primary concern we have is that between the two individual defendants, Mr. Vogel and Mr. Corbin, while we think it's at least arguable that one could be held individually liable, we think that as a matter of logic, it is simply impossible to hold both individually liable. We believe that Mr. Corbin was acting at the direction of a supervisor, Mr. Vogel, at the recommendation of another supervisory member, Mr. Beers, a non-defendant. And therefore, in carrying out those recommendations and directions, he should not be held individually liable for his performed behavior that night. Kennedy. What was the amount of attorney's fees awarded to the plaintiff in this case? The ultimate total, including costs, Your Honor, was about $110,000 based on an award of a, I mean, on a request of about $190,000. So I think the total award was in the approximately $110,000 area, which I think points out, may point out to the Court the danger, the concern we have about the practical impacts for a center to guess wrong or to make an incorrect determination and end up in litigation. The financial prospects are ruinous to a small organization. Some of those folks didn't act very diplomatically, did they? Your Honor, there's no doubt that they didn't. As a matter of customer relations, it was probably a disaster. One thing I learned early on, a long, long time ago, that I don't want to go into a long story, but when you deal with dogs and you deal with cats, you know, you deal with pets, but especially dogs and cats, it just arouses a lot of emotion in people. I mean, this probably made the newspapers, too, didn't it? It has a little. I mean, anything that involves a dog or a cat is in front-page news. And all right. Did you raise in the trial court the individual defense of Corbin and Vogel, that they're not liable under Title III of the ADA because they don't own, lease, operate, make place of public accommodation? No, Your Honor. We did not raise that particular defense. We raised the defense that they should not be individually liable. I'm sorry. Let me back up. Yes, we did raise that defense, and the Court, I think, implicitly determined or that they had exercised, they held positions of authority with the owner or occupant of the facility and that they exercised their discretion improperly and discriminated against Ms. Lantini. So, yes, we did raise the defense of there should be no individual liability. All right. You're down to your two minutes. Thanks, Your Honor. Good morning, Your Honor. Amy Vanderbilt on behalf of the Plaintiff Appellee, Kathleen Lantini, who is also present, along with Jazz, her service animal. I'd first like to address the issue that defense counsel discussed for quite a bit and that is whether or not the modification of the policy regarding admission of service animals that have made noises at prior events is an appropriate – whether the test outlined by the district court was an appropriate test. And what I want the Court to first understand is that was not the reason that Ms. Lantini was ejected from the center on the night of the incident. The Court found that the real reason that she was denied access was because center staff did not believe her dog was a service animal because they thought it was a pet. They thought it was a lap dog. And that's evidenced in the Court's ruling at – Ms. Vanderbilt, are you not going to address the appropriateness of the – Oh, absolutely. Absolutely, Your Honor. I thought you were starting with regard to the issue of the fundamental alteration. I – that's exactly where I'm going, Your Honor. But I just want the Court to understand that that's an argument that was raised later by defense counsel. And if what the Court will recall is that defense counsel first said, we would exclude any animal. We, under our policy, would have the opportunity to exclude all service animals even before they come in and made a noise. That's one position they've taken. The next position they've taken is, well, no, we wouldn't allow – we would allow the service animals in. Do you hear that noise? Yeah. That's a deer. Well, while you're on that subject, what's unreasonable about requiring some kind of identification of service animals so that every Tom, Dick and Harry that likes each dog doesn't decide to come in and bring the dog and claim equal protection of the  I appreciate that question, Your Honor. There's actually been cases that hold the green versus – I can't remember the defense name, but the green case says that certification is not required in order to allow it. Well, what about wearing a little sweater that says, I'm a service dog? Let me address the – thank you, Your Honor, for that question. First of all, there are no national standards relating to certification. There are no State standards relating to certification. Ms. Lantini could create a document that says, I certify. We have enough bureaucracy in this country, so don't urge the organization of a new one to certify these things. But the reason, Your Honor, is that there are no national standards for certification. So when requiring certification of a service animal means nothing. Who's to certify it? What standards are they going to meet for certification? The second issue is asking whether or not a service animal ought to be required to wear a vest for identification. Ms. Lantini is the perfect example of why that is inappropriate. She can't put a vest on her dog. She doesn't have the physical capabilities to do so. Her dog has a tag that she obtained from the San Diego County Animal Control Board that says that it's a service animal. She has a card, and she had a card on the night of the incident from the organization that she was training with that said this is a service animal in train. It's a service animal accorded to the San Diego County Animal Control Board. It's in a training program, and they still didn't accept that. So to require those sorts of things is, for some people, possible and for others  And you shouldn't exclude people with disabilities who don't have mobility in their arms because they can't put a service – a vest on their service animal. So there are real reasons why that's not an appropriate argument. And that doesn't stop every Tom, Dick and Harry from saying this dog is my service animal and I'm bringing it in. And there are going to be soft laws regardless of what the law is. But it also doesn't prevent an organization from excluding an animal if the animal's behavior is inappropriate. And that leads me to the fundamental alteration argument in this case. The district court came up with a brilliant test. This is the first time that this – that service animals and the admission of service animals has ever been addressed, that I'm aware of, as far as whether or not its conduct would constitute a fundamental alteration. We have the Johnson v. Gambrenous case, which says that the presence of a dog in certain areas may pose a fundamental alteration to the brewery. In that case, what the Court found was the tourists who go in without headgear, without any covering whatsoever, who stick their faces over the brewing vats, actually posed a much greater health risk than the dog did, than the dog. So what the Court in that case said, and what the Martin v. PGA case says, is that you have to take every case and determine on a fact – fact-by-fact basis whether or not that dog's admission is appropriate or not, or whether or not that accommodation is required, or whether or not it's a fundamental alteration. What defendants have argued throughout this case, but it wasn't in place at the time of the actual exclusion, what they've since argued is any noise by a dog is a – is a disruption, and any disruption is a fundamental alteration. And what the trial court said was baloney. Every noise by a dog is not a disruption. They say we're aware of two cases, two incidents where a miscellaneous dog barked. Actually, their person most knowledgeable, Randy Vogel, was only aware of one incident. And the testimony that's before the Court is he wasn't even certain it was a dog, and he didn't know when it barked. And on the night of the incident, right after the concert, he had conversations with Ms. Lentini because she wanted to complain about the parking and the ramp. She wanted to talk about access issues. He never spoke with her about the dog, never said the dog was a problem.  As a matter of fact, the evidence also says that Alan Corbin, who called security, said the dog barking wasn't even a thought in my mind. I didn't let her in because she didn't show her tickets. Oh, and I also thought that her dog was a lap dog and not a service animal. The Court in this ruling said the argument that she didn't show her tickets was not only pretextual, it was untrue. The Court found the real reason she was excluded was because the dog, the employees didn't believe her dog was a service animal because it's a small lap dog and they didn't have appropriate training. Now, the test that was set forth by the Court, as I said, is a brilliant test. It allows a fair and reasoned determination of the rights of a person with a disability versus the rights of the public accommodation. It says if a service animal's behavior is appropriate, that even if disruptive, the service animal's behavior is inappropriate or would not otherwise be accepted and engaged in by a human being, that under those circumstances the service animal can be excluded. And that makes complete sense. And we've set forth examples in our answering brief. In Ms. Lantini's case, she has a dog that yipped during intermission to alert her that there were people coming towards her quickly, and that was appropriate service animal behavior. It wasn't disruptive. But if in the course of the theater event someone came towards her quickly and the dog yipped to alert her, that might be disruptive because it's in the course of the event, but it's an appropriate sound because it's alerting her to something that is unusual, somebody coming towards her. Now, that disruption doesn't necessarily mean it's a fundamental alteration. And that's what the Martin v. PGA, this Court said in its decision in Martin v. PGA. What the defense argued there, the PGA argued, was any alteration of the game is a fundamental alteration. And what the Court said, no, that's not, we're not going to accept that. It has to be a fundamental alteration. Now, Ms. Lantini's dog barking and causing a disruption, it might be a disruption, but it's not a fundamental alteration, if it's appropriate. If her dog, the person coming towards her, it might very well have been somebody who was going to fall on her that would allow Ms. Lantini to move her wheelchair back to a side to keep her from being pushed out of her chair. She doesn't wear a seat belt. So that was an appropriate, that might have been an appropriate bark on the part of the dog. Seizure disorders, what they would have you say is, well, a dog's bark is a disruption no matter whether or not it was appropriate or not. What they'd have the Court order is that a person with a seizure disorder has to leave their seizure alert dog outside in the car while they're in their, they're in the theater by themselves. Now, what's more disruptive? A dog barking and alerting someone to a potential seizure and allowing them an opportunity to get out into the lobby to have their seizure, or the person without their dog having a seizure in the middle of the event itself? What the Court also said was, if that would, if it would be appropriate for a human being to engage in that activity, it's appropriate for a service animal. You're replacing a personal assistant with a service animal who, as a matter of fact, or which, as a matter of fact, can perform services that human beings can't perform. I don't know of any human being who can say, excuse me, you're about to have a seizure, or excuse me, your blood sugar is low, you need to take some insulin. I don't know of a human being that can do that. But service animals can. How do they do that? I have no idea, Your Honor. It's, they sense, what the theory is, that they sense an electrical chemical change in the human being. As a matter of fact, I saw in 2020, service animals can smell, or animals can smell tumors, cancerous tumors in people because of their sense of, of smell. It's amazing what they can do. And the Court was exactly right. A service animal and a human being are a unit. To separate them is detrimental to the unit, not just the dog, but the unit. Now, what Defense has argued, again, after this incident occurred, is, well, we have assistants available who would do anything that Ms. Lantini needed. She had a friend there, a companion there, the person that she invited to the event, who could assist her. Well, I didn't see anything at trial. I'm not aware of any evidence in the record that says that the center offered to send somebody home in her van so that they could help her pick up her keys when she took them out of ignition if she happened to drop them, or when she put them into her house door and dropped them. That's what she needs her service animal for. That's one of the primary functions of this service animal. So in laying out this test, the Court, as I said, has a two-pronged test, whether or not the service animal's behavior is reasonable. And, again, that's a great test because the animal's behavior has to be reasonable. If a person coming towards Ms. Lantini is coming at a slow pace and isn't posing any threat to her, and her dog barks, a reasonable person can say that's not appropriate service animal behavior. That person is not really providing a benefit to Ms. Lantini. If a dog barks and yips and doesn't be quiet for five minutes, it doesn't take a rocket scientist to figure that out. And counsel's argument that, well, you know, we'd have to go through each one of these cases and determine what the purpose of the dog's bark was and whether or not it was reasonable, well, heck, that's what all the courts say we're supposed to do when we look at reasonable accommodation in fundamental alteration cases. We're supposed to determine whether or not the conduct was reasonable. Now, it might be after the fact. Sometimes the public accommodation is wrong and sometimes they're right. Sometimes the courts determine their conduct was reasonable and sometimes they made a bad judgment. But in this case, again, it's whether or not the service animal's behavior was reasonable or whether or not it might be appropriate if engaged in by a human being. And that then also covers the sort of situations when you have a service animal who misbehaves, who barks at a bearded man, but it's at a stadium event, it's at a football game, and people are yelling and screaming. Even though that service animal's behavior is inappropriate, it's not disruptive. It's not – it doesn't alter the game. It doesn't fundamentally alter the game because that same sort of behavior is accepted by human beings. Now, if this Court accepts the defendant's arguments, the Center for the Arts' arguments, they would have the opportunity to exclude all service animals, blind person with a black lab, even before it made a sound. So I submit that the district court's ruling was a very reasoned and a very educated and a very wise test to determine whether or not service animals ought to be accommodated. Now, going on to personal liability, what the court – what defendants have argued is that Mr. Corbin acted at the direction of Bruce Beers and Randy Vogel. And the district court – this is a bench trial. The district court heard Alan Corbin testify, heard Randy Vogel testify, heard Mr. Beers testify. And the district court determined, based on the evidence before him and the credibility of the witnesses, that Alan Corbin acted on his own, that he had discretion and authority to call the police, to sign a citizen's arrest form, and to have Ms. Lantini threatened with arrest. Do you have any cases in which a – which respond to that superior liability was imposed on the individual who worked in the place? The statute says any person who owns, leases, or operates. Now, Corbin didn't own, lease, or operate anything. He was apparently operating as a free agent, doing what he thought management might want him to do. But that isn't covered by Title III, is it? Well, actually, the Howe v. Hull case says individual liability can be imposed on an individual if they were acting within the – Which case? Howe v. Hull, Your Honor, and it's actually cited in the defendant's case. That's the Northern District of Ohio case? Yes. Okay. We can find it. Okay. What that – what the Court said in that case was that you can hold an individual liable if the plaintiff proves the defendant was in a position of authority of authority, that in that position he had the power and discretion to perform potentially discriminatory acts, and the discriminatory acts were the result of the exercise of his discretion as opposed to the implementation of institutional policy or the mandates of his superiors. And the Court in this case found Alan Corbin was not acting as a result of the mandates of his superiors. The Court found that he was acting on his own belief that this dog was not a service animal. He wasn't acting because Randy Vogel said, I heard the dog bark and I don't want people to – I don't want that dog allowed in any longer. What he said was he didn't even know that barking was an issue. He didn't let that dog in because he believed it was simply a lapdog, a pet, and she didn't show her tickets. So the Court, with all of its evidence before it, found that Alan Corbin acted on his own. That's why the Court imposed $5,000 of damages liability against Mr. Corbin. The Court also imposed liability on Mr. Vogel, but only $1,000, because Randy Vogel ordered the rest of the staff, and Mr. Corbin directed them, not to allow her – not to allow Ms. Lantini in. But the Court found, again, with all the evidence before it, that Alan Corbin was not acting at Randy Vogel's direction. But by virtue of Randy Vogel's direction to employees, he had some culpability as well. Remember, it wasn't just Alan Corbin involved in this. Also, the security staff was involved. Bruce Beers was involved in this. All of them had had – Bruce Beers had had discussions with Randy Vogel beforehand, where they all talked about, that's just a lap dog. She keeps bringing that pet in. We've told her over and over again, she can't bring her pet in. There's evidence in the trial testimony to that effect, that they told her repeatedly, you can't bring the dog in, because they didn't believe it was a service animal. So the Court, with all the evidence before it, found that Mr. Corbin acted on his own and that Randy Vogel acted on his own. There was no policy at that time – and I'd like to direct the Court's attention to paragraph 47 of the Court's findings of that, that now the current policy is that they don't allow service animals in that have made a noise at the – the current policy of the center is it doesn't allow service animals in that have made noises at prior events. That's the current policy. But the Court also found at paragraphs 55 and 56 that at the time of the incident, there was no such policy. The center has somebody to thank for coming up with that policy subsequent to the incident, but at the time of the incident, there was no such policy. Randy Vogel and Alan Corbin acted on their own, within their own power and discretion. There's also evidence in the case, and that is referenced in our answering brief, that they had the power and authority. The only policy in effect at the time, the only formal policy in effect at the time was a written policy that said no certified service animals. All these other policies that have come up that the Court finds objectionable, that the district court finds objectionable, were introduced at trial or came up in discovery after that. But at the time of the event, the only policy they had was that no certified service – that only certified service animals were allowed entry. And if I have time left, I'd like to reserve it for rebuttal. You are – you're the appellee. You've got to use it all up. All right. Or you can rest on your argument. You don't get any more rebuttal is all I'm saying. You can save it for the next time you come here. I'd like to rest. Thank you. Okay. Thank you, Your Honor. There are several points I'd like to respond to. Number one, the Center's policy was effective. Ms. Lantini attended 10 or 11 previous performances without incident. She was able to attend the performances. She was welcome to attend the performances. And it was only after the yipping at two events that led to the confrontation that we're dealing with today. But the Center's policy worked to admit people with their service animals. Number two, in terms of – how do you respond to the Court's factual finding that the true motivation for your individual employee's behavior was that they simply didn't believe that Jazz was a service animal? Don't we have to accept that as a verity? I think we have – I think we have – Mr. Corbin's testimony was conflicted, in which he did say that he excluded the service animal because he didn't think I think what's even more reliable is testimony which was admitted from the police officers who were called to the scene that night who testified that what Corbin told them at that time, on the night of the incident, when they asked him, why do you want to remove this lady, he told them there on January 13, she – because this dog has made noise at prior performances. So I – there's not much I can say about his conflicted testimony, Your Honor, except to say I think it would be more reliable to accept his testimony that he gave at the scene on the evening it occurred. Second point to make is, while we believe that district court – He was a district judge. He didn't go for that, did he? He didn't go for that, Your Honor, if I were to make my informed estimate as to why. I think Mr. Corbin didn't behave appropriately the night of the event, a circumstance with some poor customer relations, and I think his testimony and trial – I mean, you had a woman in a wheelchair and you call the police on a citizen's arrest. Oh, boy. There's no doubt he handled it poorly, Your Honor. We think, though, that it's important to distinguish between someone who handles the situation poorly and someone in a center and its employees who violate or their behavior violates the ADA. That's a critical distinction. The center is embarrassed to be in this position. There is evidence of the significant outreach effort. It makes its sole purpose is to increase access for everyone to the arts services it provides. This is a remarkably disappointing situation for it to find itself in. That's why we ask the Court to please distinguish between someone who behaved poorly from a customer relations standpoint and a center which – whose policy does or does not violate the ADA. Well, apparently the employees didn't get to work. At least one employee did not, Your Honor. And maybe just I'll end with that note to distinguish on the damages claim. If Mr. Corbin was acting on his own and if he didn't get the word and if he handled it poorly, then there is no basis to hold his supervisor, Mr. Vogel, responsible. Mr. Vogel was not even there the night of the event. Whatever he did or didn't do, whatever he said staff should do or not do, Mr. Vogel wasn't present. But didn't the district court find that Mr. Vogel was motivated by a belief that this truly was not a service dog? Mr. Vogel testified that he told staff not to admit Ms. Lantini in a service dog. If that's the case, then Vogel should be liable, but not Mr. Corbin, who would be following what his supervisor told him to do. We just have a problem holding both of them liable for inconsistent purposes. But it was Vogel who threatened to have Ms. Lantini arrested. He's got a way around it. I'm sorry. Gorgel was not present. He made a direction of his supervisor. Mr. Corbin. Corbin was present and did handle the situation. Okay. With that, Your Honors, we do ask you to consider the suggestions we've made that the reasonableness of the modification should not be confused in the analysis with whether that reasonable modification actually fundamentally alters the services. Thank you. Thank you. The matter stands submitted. Thank you. I'll pick up the next matter, which is U.S. versus
judges: Goodwin, Pregerson, Tallman